U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

FEB 2 2 2006

ROBERT H. SHEMWELL, CLERK
BY _____
            DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

LARINE PETERS O/B/O BILLY            CIVIL ACTION
RAY WILLIAMS,                        NO. CV01-0051-A
            Appellant

VERSUS

JO ANNE B. BARNHART,[1]               CHIEF JUDGE F.A. LITTLE, JR.
COMMISSIONER OF SOCIAL SECURITY,     MAGISTRATE JUDGE JAMES D. KIRK
            Appellee

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Larine Peters ("Peters") filed an application for supplemental security income ("SSI") benefits on behalf of her minor son, Billy Ray Williams ("Williams") on November 1, 1995, alleging a disability onset date of May 1, 1994 (Tr. p. 63) due to mental problems (Tr. p. 98). That application was denied both initially (Tr. p. 68) and on reconsideration (Tr. p. 80).

A de novo hearing was held before an administrative law judge ("ALJ") on March 26, 1998, at which Peters and Williams were present with an attorney and two witnesses (Tr. p. 26). The ALJ found that, although Williams suffers from major depression and anxiety disorder and has marked limitations in personal functioning, less than marked social limitations, and less than marked limitations of concentration, persistence and pace, he does

---

[1] On November 9, 2001, Jo Anne B. Barnhart became the Commissioner of Social Security. In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Ms. Barnhart is substituted for Larry G. Massanari as the appellee in this action.

not have an impairment which results in marked and severe functional limitations and, therefore, was not disabled as defined by the Social Security Act at any time through the date of the ALJ's decision on August 19, 1998 (Tr. pp. 15-22). On appeal, the district judge vacated the Commissioner's decision and ordered the case remanded to the Commissioner for consideration as to whether Williams' impairment meets or equals a listed impairment (Doc. Item 13).

A supplemental hearing was held before an ALJ on March 17, 2004, at which Williams appeared with his attorney and a witness (his mother, Peters) (Tr. p. 284). The ALJ found that, although Williams suffers from a depressive disorder with psychotic features, a history of attention deficit disorder, and an anxiety disorder, he does not have a mental disorder that meets or equals a listed impairment and, therefore, he was not under a disability at any time through the date of the ALJ's decision on May 28, 2004 (Tr. pp. 186-187). Peters requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 170) and the ALJ's decision became the final decision of the Commissioner.

Peters and Williams next filed this appeal for judicial review of the Commissioner's decision. They raise the following issues for review on appeal:

> 1. The Commissioner erred by failing to find that Billy Ray Williams suffers from a listed impairment or a combination of impairments which meet or medically or functionally equal a listing, and his decision is not supported by substantial evidence on the record as a whole.

2

2. The Commissioner erred by failing to request the presence of a medical expert at Billy Ray Williams' hearing.

## ALJ's Findings

Under the evaluation process for determining whether a child is disabled, the ALJ has to determine (1) whether the child is engaging in substantial gainful activity; (2) if not, whether the child has a severe impairment; and (3) if so, whether the child has an impairment which meets or equals the severity of a listed impairment.[2]  See Harris v. Apfel, 209 F.3d 413, 417-418 (5th Cir. 2000).  If a severe impairment is found, then it must meet the duration requirement to determine if the claimant is disabled. 20 C.F.R. 416.924. If a child's impairments do not meet a listed impairment, a functional limitation assessment is done to determine whether the functional limitations are disabling (functional equivalence for children).  20 C.F.R. § 416.926a.

The ALJ found that Williams' has never worked, his severe impairments of a depressive disorder with psychotic features, a history of attention deficit disorder, and anxiety disorder did not result in any marked limitation in functioning, and Williams was not disabled at any time through the date of the ALJ's decision on May 27, 2004 (Tr. pp. 178-187).

---

[2] In August 1996, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. No. 104-193, 110 Stat. 2105, 42 U.S.C. § 1382c, changed the standards for defining and determining childhood disability for SSI by eliminating Step 4 of the prior sequential analysis (whether the child's impairment is of comparable severity to an impairment that would disable an adult) and the need for the ALJ to do an Individualized Functional Assessment ("IFA").

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. Crouchet v. Sullivan, 885 F.2d 202, 204 (5th Cir. 1989). For the evidence to be substantial, if must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have

authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

### Summary of Pertinent Facts

#### 1. Medical and School Records

When Williams was eight years old, he was admitted to the Crossroads Regional Hospital from November 24, 1995 through December 8, 1995, by Dr. Michael Parker, a psychiatrist, and treated for major depression, single episode, with psychotic features and conduct disorder (Axis 1)[3], borderline intellectual functioning (Axis II), and a GAF[4] of 20 (Axis V) (some danger of

---

[3] Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning ("GAF"). The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 27-35 (4th ed. 2000) ("DSM-IV-TR").

[4] The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness. The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year. DSM-IV-TR at pp. 32-34 (4th ed. 2000). The GAF scale goes from 0-100: **91-100** - superior functioning in a

5

hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication) (Tr. pp. 126-132). Williams had symptoms of depression and auditory command hallucinations; Williams had recurrent urges, threats and attempts to kill siblings and his mother, and heard voices instructing him to kill others and making derogatory comments about himself (Tr. p. 124). Williams had deliberately tried to set his house on fire at least twice, was preoccupied with knives, had shaved off his eyebrows with a knife, had left school several times without permission, and could not tolerate being told "no" (Tr. p. 124). Treatment with Mellaril resolved the psychosis and psychotic

---

wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities, no symptoms; **81-90** - absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns; **71-80** - if symptoms are present, they are transient and expectable reactions to psycho-social stressors, not more than slight impairment in social, occupational, or school functioning; **61-70** - some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships; **51-60** - moderate symptoms OR moderate difficulty in social, occupational, or school functioning; **41-50** - serious symptoms OR serious impairment with social, occupational, or school functioning; **31-40** - some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood; **21-30** - behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgement OR inability to function in almost all areas; **11-20** - some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication; **1-10** - persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death; and **0** - inadequate information. DSM-IV-TR at 34. See also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

behavior. It was noted that Williams' mother, Peters, had difficulty understanding and accepting Williams' problems and was in denial (Tr. p. 126). Williams' had a verbal IQ of 82, a performance IQ of 79, and a full scale IQ of 78 (Tr. p. 125). Williams was continued on Zoloft and Mellaril, following his discharge from the hospital on December 8, 1995 (Tr. p. 127).

In November 1995, Dr. Stuart Kutz, a psychologist, made a consultative evaluation of Williams (Tr. p. 132). Dr. Kutz found that Williams was an 8½ year old boy whose intellectual functioning was at the upper end of the borderline range overall and his basic academic skills overall were low average. Although there was no indication of any specific learning problem, Williams' below average basic academic skills and general intellect indicated he would have difficulty obtaining consistently average or better grades in a regular classroom setting "even given adequate effort and motivation" (Tr. p. 132).

On January 17, 1996, Williams' second grade teacher evaluated Williams and noted that Williams needed special assistance with academics every day, but only occasionally had difficulty interacting with peers, broke school rules, was disrespectful or defiant with authority, required administrative discipline, was inattentive or off task in class, was easily distracted, and needed supervision to remain on task (Tr. p. 113). Williams' teacher believed Williams to be functioning at a low academic level in second grade (Tr. p. 114). Williams was evaluated with a learning disability and repeated the second grade in the 1996/1997 school

7

year (Tr. pp. 118, 120).

In March 1996, Dr. George Hearn, an industrial psychologist, evaluated Williams. Dr. Hearn found Williams to be easily irritated, his thought processes had some looseness of association, and he was still hearing voices, although there was evidence of improvement in his conduct (Tr. pp. 134-135). Williams' mother reported that Williams had recently thrown a knife at a sibling and tried to hit another with a fireplace poker, and Williams admitted to mild suicide ideations (Tr. p. 135). Dr. Hearn found that Williams' improved status on discharge from Crossroads Hospital was unchanged, he appeared to be functioning fairly well in school, although academically and intellectually he was in the borderline to low average category, and his concentration, persistence and pace appeared adequate for task completion in second grade (Tr. p. 135). Dr. Hearn further found that Williams' prognosis for personal and behavioral problems was guarded and he needed ongoing mental health attention and future reassessment, but there was evidence of improvement relative to depression and the psychotic features were less prominent (Tr. p. 135).

In November 1997, Williams was suspended from school for one day because he attacked another student with his fists (Tr. p. 140).

Williams was re-admitted to Crossroads Regional Hospital from March 31, 1998 through April 6, 1998, by Dr. Lyn Goodin, a psychiatrist, due to auditory hallucinations and concerns that he would harm himself (Tr. p. 145). Williams was ten years old, and

was taking Zoloft and Desyrel as antidepressants. Williams reported he had been hearing the voices for several months but that they were primarily telling him good things and he was not having suicidal thoughts (Tr. p. 145). However, Williams was reported to have burned his face with a hot iron. Williams was found to have a systolic heart murmur and was slightly obese (Tr. p. 145).

Williams' had a full scale IQ of 85 and his basic skills age was equivalent to eight years, six months. The Bender Visual Motor Gestalt showed multiple distortions and misperceptions in his drawing efforts. On the CDI, a measure of depressive symptoms, Williams had an above average score. The RCMAS, a measure of anxiety based symptoms, suggested a highly significant anxiety level (Tr. p. 145).

During his hospital course, Williams was noted to sometimes report and then deny hearing the voices, but it was discovered that Williams' mother had been cautioning him not to talk about the voices. Williams also had problems with nightmares and enuresis (Tr. p. 145). On discharge, Williams had an improved mood and no thoughts of self-harm, and was continued on Prozac. Williams' discharge diagnosis was major depressive disorder with psychotic features and overanxious disorder (Axis I), obesity and a history of sleep apnea (Axis III), and a GAF of 50 (Axis V) (serious symptoms or serious impairment with social and occupational functioning) (Tr. p. 146).

One month later, on May 4, 1998, Williams was still not hearing voices and his mood was okay (Tr. p. 154). In June 1999,

9

it was noted that Williams had completed the fourth grade in summer school (Tr. p. 153). Williams' mother reported that Williams had been playing with fire again and had made a "burned spot" in the bathroom, he had wrecked the car in the driveway ($3000 of damage), he had "chopped" ridges into his furniture and carved his name in his bed (Tr. p. 153). Williams denied behavior problems in school, denied hearing voices, denied depression or thoughts of harming himself or others, and denied having difficulties with his temper. However, Williams stated he was not taking his medications and was having problems with concentration (Tr. p. 153).

In July 1999, Williams still denied having further problems with hallucinations, mood or anger, although his sleep was erratic (Tr. p. 152). Williams' mother stated Williams did not need special education, even though he had attended summer school (Tr. p. 152).

Williams underwent a psychiatric evaluation with Dr. Roy R. Ragsdill, a psychiatrist, on September 5, 2000 (Tr. p. 161). Williams reported feeling depressed and having trouble paying attention at school (Tr. p. 161). Dr. Ragsdill diagnosed depression, NOS and probable ADHD, Inattentive Type (Axis I), borderline to low average range intellectual functioning (Axis II), and obesity (Axis III) (Tr. p. 165). On Axis IV, Dr. Ragsdill found:

> "Moderate to severe, inadequate male role models at home. Mother has been more or less making excuses for the patient's behavior rather than setting limits. Father has been verbally abusive to him continually. He is isolated from friends as well."

10

On Axis V, Williams had a GAF score of 52-55 (moderate symptoms or moderate difficulty with social and occupational functioning) (Tr. p. 165). Dr. Ragsdill discussed with Peters the importance of setting clear rules for Williams and sticking to them, not making excuses for Williams, encouraging Williams to participate in sports or physical activities as an outlet for aggression, having Williams spend more time with his uncle, and resuming Williams' medication (Zoloft) (Tr. p. 166).

In December 2003, Williams was evaluated by Dr. Sandra B. Durdin, a clinical psychologist (Tr. p. 223). At that time, Williams was 16 years old, in the eighth grade, average height, very overweight, polite, cooperative, and talkative (Tr. pp. 223-224). Williams was not undergoing mental health treatment at that time (Tr. p. 224). Dr. Durdin found Williams had good sustained attention, good articulation but only a high borderline range vocabulary, a normal range of affect, a moderately depressed mood, no signs of thought disorder or perceptual distortions, denied suicidal or homicidal ideation or intent, and denied substance abuse (Tr. p. 224). Dr. Durdin also found Williams was "rather disgruntled, chronically unhappy" with a moderate degree of depression, oppositional behavior, a tendency to focus blame elsewhere, was lonely, was not taking medication or receiving counseling, was doing poorly in school, and was very overweight (Tr. p. 225). Dr. Durdin estimated Williams' IQ as from high borderline range to low average (Tr. p. 225). Dr. Durdin diagnosed

dysthymic disorder,[5] disruptive behavior disorder, NOS, and learning disorder, NOS (Axis 1), and absence of a father figure, lax structure and discipline, recent death of his grandmother, and lack of close peer relationships at Axis 4 (psychosocial stressors) (Tr. p. 225).

Dr. Durdin further found Williams had adequately sustained attention for simple repetitive tasks, did not use or acquire information as well as a child with normal intellectual functioning, was two to three grades below his chronological age with estimated high borderline to low average intelligence, can move objects without difficulty, has good manners but is impulsive to a moderate degree, which causes discipline problems, is probably best in one-on-one sessions and poor in groups, easily daydreams, and has adequate self-help skills (Tr. p. 225). Dr. Durdin recommended educational and vocational planning, and taking Williams out of a regular school environment and placing him in a vocational setting with more one on one attention and tasks he has success with (Tr. p. 225).

On an adult psychiatric review technique form,[6] Dr. Durdin

---

[5] MEDLINEplus Health Information, Medical Encylopedia: "Dysthymia" is a chronic form of depression, characterized by moods that are consistently low, but not as extreme as other types of depression, *available at* **http://www.nlm.nih.gov/medlineplus/encyclopedia.html** (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[6] It appears that Dr. Durdin twice requested the appropriate form for reviewing children, but was never provided with that form.

noted Williams has moderate limitations in his ability to carry out detailed instructions and ability to make judgments on simple work-related decisions, moderate limitations in his abilities to interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting, due to his behavior disorder, mood problems, an variations in social adjustment due to the circumstances and types of authority figures involved (Tr. pp. 226-227). Dr. Durdin noted she had been provided with a form for adults rather than a form for children.

### 2. 1998 Administrative Hearing

At the 1998 administrative hearing (Tr. pp. 26-61), Peters testified that Williams was then ten years old, a little overweight, has two brothers and one sister, ages 24, 14 and 12, and was in the third grade in regular classes with tutoring in math, reading and spelling (Tr. pp. 31-32). Peters testified that Williams repeated the second grade one time, and can read and do simple math (Tr. p. 33). Peters further testified that Williams has had disciplinary problems in school, disrupting the class and fighting (Tr. pp. 33-34). Williams has friends at school, and at home he enjoys playing basketball and watching TV; Williams also does chores such as making his bed, vacuuming and washing the dishes (Tr. pp. 34-35, 43). Peters has to check Williams' school books for homework and make him do his homework (Tr. p. 43).

Peters testified that, when Williams gets up in the morning,

13

he dresses himself, but has to be reminded to brush his teeth (Tr. p. 35). Williams goes to church sometimes, but is fidgety (Tr. p. 35). Williams fights with his brother and sister who still live at home; once, he went after his brother with a knife and another time he tried to hit him with the fireplace poker (Tr. p. 35). Williams shaved the hair off the front of his sister's head, cut up his brother's and mother's clothes, and cut on the furniture (Tr. p. 35). Peters testified that, when she has whipped Williams for misbehavior, he has retaliated by breaking dishes, breaking a window, setting the bathroom on fire, damaging the car, and setting his grandmother's sofa on fire (Tr. p. 36).

Peters testified that the doctors told her Williams hears voices, suffers from depression, and cannot hear well (Tr. p. 36). Peters reported that Williams said the voices tell him to do bad things and he "can't help it" (Tr. p. 37). Williams first told a counselor about the voices he hears, then a doctor told Peters that Williams' test results indicated Williams hears voices (Tr. p. 37). When Williams was at Crossroads Hospital in 1996, he burnt his hand by putting salt and ice on it, and had a dream about killing another boy there (Tr. p 37). Williams' medication prescription is renewed every six months (Tr. p. 38). Williams also complains that he knees hurt when he runs, he has headaches every day, and he gags and throws up in his sleep; Williams' doctor explained the gagging and throwing up are part of Williams' bad dreams (Tr. pp. 39-40). Williams complains of hearing the voices almost every day (Tr. p. 41).

14

Peters testified that Williams never completes tasks at home or at school unless monitored (Tr. p. 41). When Williams does not get what he wants, he tries to kill himself with a knife or by falling asleep in the bathtub to drown himself (Tr. p. 41). Williams has also shaved his eyebrows off (Tr. p. 41). Williams gets upset when he has a bad day at school, if he is jealous about something someone else has, or if someone changes the TV channel when he is watching TV (Tr. p. 42). Peters testified that Williams still has a daily problem with wetting the bed, and has problems with his hearing; Williams is unable able to hear things everyone else can hear, but hears voices no one else can hear (Tr. p. 42). Williams shop-lifted once at Wal-Mart, and takes things from his siblings (Tr. p. 43). Peters testified that Williams tries to behave correctly, but misbehaves because of the voices he hears (Tr. p. 43).

Alvin Rae Johnson ("Johnson"), Williams' step-father, testified they have to "keep after" Williams to do his homework and complete his chores, and that, when Williams throws temper tantrums over things like the TV, he talks to Williams about self-control and makes Williams apologize (Tr. pp. 44-45). Johnson also testified that, if Williams becomes jealous over something someone else has, he may destroy it, cut something up, or hide food, dishes or other things (Tr. p. 45). Johnson testified that he seems to get along pretty well with Williams because Williams talks to Johnson about the voices he hears, and Johnson tries to keep Williams from watching scary shows on television (Tr. p. 45).

15

Johnson testified that Williams plays with matches, and has burned curtains and the bathroom (Tr. p. 46); if Williams' mother tells Williams to do something, such as homework or chores, or if Williams gets angry about something, Williams may set something on fire (Tr. p. 46). The voices may help Williams do a good job with his homework, or may tell him not to do it at all (Tr. p. 47). Johnson said that Williams has a "hot temper," mostly from jealousy, but that his temper does not last long (Tr. p. 46). Williams reminds his mother to give him his medications (Tr. p. 47). Johnson testified that when Williams hears the voices, he may lie down and fall asleep or ask his mother for his medication, and sometimes he wakes up at night and throws up (Tr. p. 48). Johnson has also observed Williams having problems concentrating, such as when he does his homework (Tr. p. 48).

Queena MacGill ("MacGill") testified that she met Peters and Williams in 1993 or 1994, when she worked for a medical transport company and drove Williams and his brother and sister to school (Tr. p. 49). MacGill testified that Williams and his sister would fight and misbehave in the car every day (Tr. pp. 49-50). In 1995, when Williams was visiting MacGill's home, he smeared feces all over McGill's bathroom (Tr. pp. 50-52). MacGill testified that, when she visited Peters at her home, she noticed Williams and his brother and sister were very active and behaved "abnormally" (Tr. p. 52).

Finally, Williams testified that he is ten years old, in the third grade, repeated second grade, has been suspended for

fighting, his favorite subject is art, and he attends regular classes but is tutored in spelling (Tr. pp. 53-56). Williams testified that he fights with his bothers and sisters when they hit each other while playing basketball (Tr. p. 56). Williams' chores are to clean the kitchen and pick up his room, which he sometimes needs to be reminded to do (Tr. pp. 56-57). Williams likes to play basketball, but is not on a team (Tr. p. 57). Williams does not have any friends that live nearby (Tr. p. 57). Williams testified that he can tell time, count money, and use a telephone (Tr. p. 57). Williams has trouble with headaches and with his knees hurting when he runs and plays basketball, but his medicine helps (Tr. p. 58). Williams also has trouble sleeping sometimes, so he stays up and watches TV, then falls asleep with the TV on (Tr. p. 58). Williams has a lot of nightmares and coughing spells when he eats a lot (Tr. pp. 58-59). Williams testified that knows he is not supposed to play with matches and scissors (Tr. p. 59).

### Law and Analysis

### Issue No. 1 - Listed Impairment

Peters contends the Commissioner erred by failing to find Williams suffers from a listed impairment or a combination of impairments which meet or equal a listing. Specifically, Peters argues that Williams meets or equals Listing 112.04, which covers mood disorders.

A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92 (1990). See also, Selders v.

17

Sullivan, 914 F. 2d 614, 619(5th Cir. 1990). For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. Sullivan v. Zebley, 110 S. Ct. at 891.

The presentation of mental disorders in children may be subtle and of a character different from the signs and symptoms found in adults. The activities appropriate to children, such as learning, growing, playing, maturing, and school adjustment are also different from the activities appropriate to adults and vary widely in the different childhood stages. Listing 112.00(A), Mental Disorders. Each listing begins with an introductory statement that describes the disorder or disorders addressed by the listing. This is followed by medical findings (paragraph A criteria) which, if satisfied, lead to an assessment of impairment-related functional limitations (paragraph B criteria). An individual will be found to have a listed impairment when the criteria of both paragraphs A and B of the listed impairment are satisfied. Listing 112.00(A).

The purpose of the criteria in paragraph A is to substantiate medically the presence of a particular mental disorder. Impairments should be analyzed or reviewed under the mental category(ies) indicated by the medical findings. The purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children. Standardized tests of social or cognitive function and adaptive behavior are frequently available and appropriate for the

18

evaluation of children and, thus, such tests are included in the paragraph B functional parameters. Listing 112.00(A).

Psychiatric signs are medically demonstrable phenomena which indicate specific abnormalities of behavior, affect, thought, memory, orientation, development, and contact with reality, as described by an appropriate medical source. Listing 112.00(B). In childhood cases, severity is measured according to the functional limitations imposed by the medically determinable mental impairment. In most functional areas, there are two alternative methods of documenting the required level of severity: (1) use of standardized tests alone, where appropriate test instruments are available, and (2) use of other medical findings. Listing 112.00(C).

Where "marked" is used as a standard for measuring the degree of limitation it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis. When standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked restriction. Listing 112.00(C). In primary school children (age 6 to attainment of age 12), the measures of function are through standardized measures of academic achievement, e.g., Wide Range

19

Achievement Test-Revised, Peabody Individual Achievement Test, etc., and the capacity to function in the school setting is supplemental information. Problems in social functioning, especially in the area of peer relationships, are often observed firsthand by teachers and school nurses, and school records are an excellent source of information concerning function and standardized testing. Listing 112.00(C)(3). As it applies to primary school children, the intent of the functional criterion, i.e., deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, is to identify the child who cannot adequately function in primary school because of a mental impairment. Although grades and the need for special education placement are relevant factors which must be considered in reaching a decision, they are not conclusive because there is too much variability from school district to school district in the expected level of grading and in the criteria for special education placement to justify reliance solely on these factors. Listing 112.00(C)(3) and (C)(4).

The presence of a mental disorder in a child must be documented on the basis of reports from acceptable sources of medical evidence. Formal psychological tests of cognitive functioning are generally in use for preschool children, for primary school children, and for adolescents. Listing 112.00(D). Finally, attention must be given to the effect of medication on the child's signs, symptoms, and ability to function. Listing 112.00(F).

20

## 1. Listing 112.04

Peters contends that Williams meets Listing 112.04. Listing 112.04 states:

> 112.04 Mood Disorders: Characterized by a disturbance of mood (referring to a prolonged emotion that colors the whole psychic life, generally involving either depression or elation), accompanied by a full or partial manic or depressive syndrome.
> This required level of severity for these disorders is met when the requirements in both A and B are satisfied.
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> 1. Major depressive syndrome, characterized by at least five of the following, which must include either depressed or irritable mood or markedly diminished interest or pleasure:
> a. Depressed or irritable mood; or
> b. Markedly diminished interest or pleasure in almost all activities; or
> c. Appetite or weight increase or decrease, or failure to make expected weight gains; or
> d. Sleep disturbance; or
> e. Psychomotor agitation or retardation; or
> f. Fatigue or loss of energy; or
> g. Feelings of worthlessness or guilt; or
> h. Difficulty thinking or concentrating; or
> i. Suicidal thoughts or acts; or
> j. Hallucinations, delusions, or paranoid thinking;
> OR
> 2. Manic syndrome...
> OR
> 3. Bipolar or cyclothymic syndrome...
> AND
> B. For...children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

The criteria in paragraph B2 of Listing 112.02, for ages 3 to attainment of age 18, are (a) marked impairment in age-appropriate cognitive/communicative function, documented by medical findings and including, if necessary, the results of appropriate standardized psychological tests, (b) marked impairment in age-appropriate social functioning, documented by history and medical

21

findings and including, if necessary, the results of appropriate standardized tests; (c) marked impairment in age-appropriate personal functioning, documented by history and medical findings and including, if necessary, appropriate standardized tests, or (d) deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner.

The ALJ concluded that Williams did not meet Listing 112.04(B) because he does not have a marked limitation in the ability to maintain concentration, persistence or pace. The ALJ found Williams' limitation in that area was only moderate, noting the evidence showed Williams has difficulty staying on task and has a very short attention span.[7] However, the ALJ applied an incorrect legal standard (Tr. p. 180); the listing does *not* require a "marked" limitation in concentration, persistence or pace, but only *deficiencies* of concentration, persistence or pace *resulting in frequent failure to complete tasks in a timely manner*. Therefore, the ALJ's conclusion is erroneous due to a legal error. However, the ALJ's finding as to Williams' moderate limitation in that area is consistent with the listing requirement.

---

[7] In the second grade, in 1995/1996, Williams' teacher noted that Williams had difficulty staying on task, did not listen to oral directions well, and had a very short attention span (Tr. p. 118). In fourth grade summer school in 1999, it was noted that Williams had difficulty remaining seated, was easily distracted, had difficulty awaiting his turn in groups, had difficulty following instructions, had difficulty following instructions, had difficulty sustaining attention to tasks, and often shifted from one uncompleted activity to another (Tr. p. 151). During Williams' September 2000 psychiatric evaluation, Williams reported difficulty with concentration in school, and he was found to have "only fair" concentration and cognition (Tr. pp. 162, 164).

The ALJ also concluded that Williams has a marked impairment in age-appropriate social functioning. Since the evidence reviewed by the ALJ shows that Williams has deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner, Williams meets Listing 112.04 (B).

Peters contends that Williams meets Listing 112.04(A)(1) Major Depressive Syndrome, as characterized by (a) depressed or irritable mood; (c) appetite and weight increase; (d) sleep disturbance; (h) difficulty thinking or concentrating; (i) suicidal thoughts or acts; and (j) hallucinations (auditory). Peters further contends that Williams meets Listing 112.04(B) through a (b) marked impairment in age-appropriate social functioning and (d) deficiencies of concentration, persistence or pace (resulting in frequent failure to complete tasks in a timely manner).

The ALJ did not review the requirements of Listing 112.04(A) because he concluded Williams did not meet Listing 112.04(B). However, the ALJ found Williams suffers from a depressive disorder with psychotic features (Tr. p. 186), and concluded that Williams has a less than marked limitation in the domain of acquiring and using information, (Tr. p. 183), a less than marked limitation in the domain of attending and completing tasks, a marked limitation in the domain of interacting and relating with others, and a less than marked limitation in the domain of caring for oneself (Tr. p. 184). Therefore, this court must determine whether the evidence shows Williams meets five of the criteria for depressive disorder in Listing 112.04(A).

It appears undisputed that Williams suffers from depression and satisfies the criteria for "depressed or irritable mood." There is also evidence that Williams had an 89 pound weight increase between the ages of eight and fourteen (198 pounds to 287 pounds), followed by a 55 pound weight loss in 22 months (287 pounds to 232 pounds). When Williams was eight years old, he was mildly obese (Tr. p. 129), he weighed 198 pounds when he was ten years old (Tr. pp. 142, 144), Williams weighed 279 pounds in August 2001 (Tr. p. 153), 280 pounds in September 2001 (Tr. p. 252), and 287 pounds in November 2001 when he was 14 (Tr. p. 249), he weighed 242 pounds in September 2003, and he weighed 232 pounds in March 2004 when he was 16 years old and 5'10" tall (Tr. pp. 278, 280). Therefore, Williams satisfies the criteria for "appetite or weight increase or decrease."

The ALJ found Williams has a moderate limitation in concentration, so he meets the criteria of "difficulty thinking or concentrating." The ALJ found Williams' has depressive syndrome with psychotic features; that diagnosis was made due to Williams' auditory hallucinations (Tr. pp. 135, 145-146, 244), which supports the criteria of "hallucinations, delusions, or paranoid thinking."

Finally, Williams contends he meets the requirement for sleep disturbance. However, the record show Williams suffers from sleep apnea; the type of sleep disturbances contemplated for chronic depression are either insomnia or hypersomnia. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, "300.4 Dysthymic Disorder," pp. 376-381 (4th ed. 2000). The record does

not show Williams has been diagnosed with hypersomnia, as alleged. Therefore, Williams has not shown he meets the sleep disturbance criteria.

Since Williams has not shown he meets the requirements of five of the criteria in Listing 112.04(A), he has not carried his burden of proving he meets Listing 112.04.

### 2. Listings 112.06, 112.08 and 112.11

Williams contends he meets Listing 112.06 for his anxiety disorder. However, although Williams has been diagnosed with "anxiety disorder," he has not alleged or shown which of the criteria in 112.06(A) he meets.

Williams contends he meets Listing 112.08, personality disorder, due to his depression. Listing 112.08 requires the claimant to have "deeply ingrained, maladaptive patterns of behavior" which include at least one of the listed requirement in Subpart A is met and, for Subpart B, at least two of the requirements in 112.02(B). Williams contends he meets Listing 112.08(A)(4), "persistent disturbances of mood or affect." However, Williams has not specified the personality disorder he suffers from. See <u>Diagnostic and Statistical Manual of Mental Disorders, Text Revised</u>, "Personality Disorders," pp. 685-686 (4th ed. 2000).[8]

---

[8] "A Personality Disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment." The ten specific personality disorders are paranoid personality disorder, schizoid personality disorder, schizotypal personality disorder,

Finally, although Williams alleges he meets Listing 112.11, Attention Deficit Hyperactivity Disorder, the administrative record does not indicate that Williams suffers from "marked hyperactivity," a requirement for meeting Listing 112.11. Instead, the record indicates that Williams was diagnosed with "probable ADHD, inattentive type" because of his attention deficit (Tr. p. 165).

Therefore, Williams has not carried his burden of proving he meets Listings 112.06, 112.08 or 112.11. Substantial evidence supports the ALJ's/Commissioner's conclusion that Williams does not meet or equal a listing in Appendix I.

Issue 2 - Medical Expert

Williams further contends the ALJ erred by failing to request the presence of a medical expert at Williams' hearing. Essentially, Williams is arguing the ALJ should have ordered a consultative examination to assess whether Williams' symptoms meet or equal a listing in Appendix 1.

The claimant has the burden of proof in establishing a disability. The ALJ has the discretion to order a consultative

---

antisocial personality disorder, borderline personality disorder, histrionic personality disorder, narcissistic personality disorder, avoidant personality disorder, dependent personality disorder, and obsessive-compulsive personality disorder. A personality disorder not otherwise specified may fall within one of three clusters based on descriptive similarities, or may present co-occurring disorders from different clusters: Cluster A includes paranoid, schizoid, and schizotypal personality disorders; Cluster B includes antisocial, borderline, histrionic, and narcissistic personality disorders; and Cluster C includes avoidant, dependent, and obsessive-compulsive personality disorders. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 685-686 (4th ed. 2000).

examination. An examination at government expense is not required unless the record establishes that such an examination is necessary to enable the ALJ to make the disability decision. <u>Anderson v. Bowen</u>, 887 F.2d 639, 634 (5th Cir. 1989). Also, <u>Brock v. Chater</u>, 84 F.3d 726 (5th Cir. 1996); <u>Wren v. Sullivan</u>, 925 F.2d 123, 1287 (5th Cir. 1991); <u>Haywood v. Sullivan</u>, 888 F.2d 1463, 1472 (5th Cir. 1989).

In the case at bar, a consultative psychological examination was performed by Dr. Durdin after Williams' case was remanded by the court to the SSA. There are numerous other expert opinions on Williams' condition in the medical evidence previously submitted. Since a consultative examination was provided, this ground for relief is meritless.

## Adult Status

As pointed out in Williams' brief, Williams turned 18 years old while this claim was pending.[9] Therefore, Williams is entitled to have his claim reviewed under the adult standard as well as the child standard. The adult standard has two steps more than the child standard,[10] the relevant one being whether, given his

---

[9] Williams was born on June 6, 1987 (Tr. p. 63).

[10] To determine disability, the ALJ must apply the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process requires the ALJ to determine whether Williams (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the

27

impairments, there is any work which exists in significant numbers in the regional or national economy which Williams can perform. Compare <u>Jones v. Barnhart,</u> 335 F.3d 697 (8th Cir. 2003); <u>Walker v. Massanari,</u> 149 F.Supp.2d 843 (S.D. Iowa 2001). Since there is not evidence as to that issue in the administrative record, the case should be remanded for further evidence and supplemental proceedings which should include a vocational expert.

Therefore, the final decision of the Commissioner should be vacated and the case should be remanded again for a determination of whether Williams is disabled as an adult.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and the case REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

---

five-step review is conclusive and terminates the analysis. <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir.1987).

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this day of February, 2006.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE